In the Matter of Sarah K. and Another, Children Alleged to be Abused. Pamela M. K., Respondent.

Family Court, Monroe County, January 6, 1989

## APPEARANCES OF COUNSEL

*Milo I. Tomanovich* and *Ruben M. Garcia* for Monroe County Department of Social Services, petitioner. *Edward J. Nowak, Public Defender (Elizabeth A. Sammons* of counsel), for respondent. *Elma A. Bellini, Law Guardian. Howard R. Relin, District Attorney (Robert F. Clark* of counsel), for County of Monroe.

**OPINION OF THE COURT**

Francis A. Affronti, J.

By petition filed May 10, 1988 and amended on May 24, 1988, the petitioner, Monroe County Department of Social Services, alleges that Sarah K., born on June 30, 1986, and James K., born on July 7, 1987, are abused children. Specifically, it is argued that the respondent mother created or allowed "to be created a substantial risk of physical injury to such child[ren] by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ" (see, Family Ct Act § 1012 [e] [ii]), all as set out in the filed petitions and attached rider.

Judicial notice is taken of all pleadings and proceedings heretofore had herein, including an existing temporary order which has, among other terms, placed the children in the foster care and custody of petitioner where they remain to date. (See, Family Ct Act §§ 1027, 1056.) The court possesses subject matter jurisdiction (Family Ct Act art 10) as well as personal jurisdiction over the respondent, who was present and represented by counsel throughout the fact-finding hearing, from which this decision derives.

The accusations insofar as they were supported by proof submitted on petitioner's direct case claimed, in essence, that the respondent, Pamela K., subjected her children to substantial risk of injury by episodes of detrimental and unreasonable conduct occurring during the winter and spring of 1988. Petitioner's initial witness, a police officer, noted that on February 16, 1988 he went to respondent's apartment and while there observed the physical appearance of her children and dwelling. Although the outside temperature was frigid or near freezing, the upstairs windows were left wide open and the building was extremely cold. At this time, one child was seen wearing only diapers while the other was clad in a T-shirt and pants. During this occasion also, the respondent and her children were present within the extremely cluttered and debris-laden apartment, which consisted of numerous books, boxes, dirty dishes, "messy" rooms and clothing, furnishings in disarray, and bathroom walls stained with urine and dried feces. Petitioner's caseworker, when receiving the referral, was refused entry to the residence by respondent, but on a later date, again very cold, she was accompanied to the home

by law enforcement officials. Upon arrival, Ms. K. was noticed within the dwelling through *open windows* but she still refused to allow the parties access. The respondent's parents were then called to the scene, and, likewise, their pleas for admission went unheeded. Three days later, after obtaining a court order to enter, the caseworker and police arrived at the premises and this time were permitted inside by respondent who was present with her youngsters. Although quite cold, as on previous dates, the dwelling windows remained open, and feces was seen not only on each child but on their bedroom walls, the bathroom walls, and in a crib.

A pediatrician who examined the children during May 1988 testified regarding each child's physical condition, including, but not limited to, their respective weights, and he expressed opinions relative to their speech, language, and motor development. Upon initial medical observation, James was undernourished, his weight substantially below normal for his then age, he showed markedly delayed over-all development and test results confirmed significant delays in the areas of motor, language, and social functions. Likewise, Sarah's weight was extremely reduced for her then age and she also experienced troubled speech patterns. The physician categorized Sarah as in the "low normal" range of development and opined that her diet while cared for by her mother was inadequate. Therefore, upon the evidence and the undisputed medical testimony, the court concludes that each child was greatly delayed, underdeveloped, undernourished, and had failed to thrive while maintained by respondent.

Petitioner's main witness, a neighbor of respondent, submitted important, and, ultimately, damaging testimony pertaining to Ms. K., and his recitations are determined to be highly credible, to the extent that they tipped the evidentiary scale, thereby forming the primary basis for the conclusions reached herein. The witness observed an incident in February 1988, in "below zero" weather, when Sarah was standing nude and unattended outside in the snow, smelling of urine and feces; the youngster was then escorted back home to her mother whereupon respondent commenced swearing and slammed the door shut.

On yet another occasion, in April 1988, and during an irrational incident which potentially could have proved deadly, the neighbor saw Ms. K. holding James by his waist completely outstretched and entirely outside her second-floor apartment window, approximately 25 feet above the ground,

which event continued for about three minutes. The observer pleaded with respondent not to drop her son and, in turn, he was told to "mind his business" or she would, indeed, drop James on his "head." A warning that police would be contacted prompted respondent to cease her activities and return the child back inside.

A speech and language pathologist rendered her professional opinion that Sarah was slowed in language and speech skills and that these deficits were the result of a prior lack of stimulation. Documentary exhibits of the children's pediatric examinations and an audiometric examination of Sarah have been considered in the rendering of this decision.

The respondent, in her testimony, essentially denied any difficulties in rearing her offspring, and in her belief, they were not physically or emotionally impaired, nor were they ever maltreated or improperly cared for while under her control.

Respondent's written summation emphasized that petitioner failed to prove abuse (see, Family Ct Act § 1012 [e] [i], [ii]), and additionally contends that the eyewitness testimony is "suspect", and therefore, not worthy of belief. Meanwhile, petitioner fosters the premise that respondent did not refute petitioner's case and, as such, believes that an abuse finding is warranted. The Law Guardian concurs and makes a similar recommendation to the court based upon respondent's "total lack of supervision and guardianship," her failure to properly nourish the youngsters, and her overt acts of jeopardy, resulting in their physical impairment, including "protracted impairment" in speech and motor skills.

The court's primary purpose, pursuant to article 10 of the Family Court Act, "is to protect children from abuse and neglect" and "not * * * to punish offenders for [their] acts", since proceedings as in the present case are "civil in nature" and "clearly distinguish[able] in [both] purpose and intent" from the criminal arena. (See, Matter of Maureen G., 103 Misc 2d 109, 113.) Child protective intervention should be limited to cases supported by substantial evidence and any willful omission in the protection of children by individuals legally responsible for their care necessitates the intervention of society, through the State. (See, Matter of Maureen G., 103 Misc 2d 109, supra.)

Under the current factual scenario, the court is hard pressed to uncover legal precedent directly on point relating

to the utilization of the relevant and applicable statute. *(See,* Family Ct Act § 1012 [e] [ii].) However, one opinion may be viewed as a possible corollary to the instant proceeding, and does provide assistance and clarification in carrying out the legislative intent of the statutory mandate. *(See, Matter of Alyne E.,* 113 Misc 2d 307.) In *Alyne E. (supra),* a child was adjudicated abused based upon her father's overt physical acts, including his attempts to choke her, and the court found, as a result thereof, that he created a substantial risk of physical injury, as statutorily contemplated. *(See,* Family Ct Act § 1012 [e] [ii].) In *Alyne E. (supra,* at 311), it was stated that "being a parent mandates an ongoing vigilance and a firm commitment to protect one's child from cognizable harm." While the respondent's fundamental right to rear her children is not disputed, court intervention is both a necessary and valid State function if the latter's rights are to be preserved.

As expounded in Besharov's Practice Commentary (McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1012, at 232) a finding that a child is abused by the creation of a substantial risk of physical injury "is merely a logical extension of the court's mission to protect endangered children[;] [u]nder it, the court need not wait until a child is actually injured before taking appropriate action," and that "the question before the court is whether the parent's *future* behavior will be sufficiently harmful to the child to justify taking preventive action". Therefore, *endangerment* of a child is all that is required for an abuse finding to be made.

This court will not ignore the actual and potential impact respondent's conduct had upon her children's physical and emotional health for "to fail to acknowledge" their " 'plight would be an affront to the clear legislative intent of article 10 of the Family Court Act; to fail to label the * * * actions as child abuse would strip the phrase of all meaning; to fail to warn other parents against this insidious type of abuse would perpetuate the suffering of countless other defenseless children.' " *(See, Matter of Roy T.,* 126 Misc 2d 172, 175-176, quoting *Matter of Shane T.,* 115 Misc 2d 161.)

The credibility of petitioner's witnesses is unquestioned and their testimony remained unrefuted, while conversely, respondent's proffered recitations were wholly unacceptable and incredible taken in light of petitioner's case and the circumstances existing at the time of the occurrences. Ms. K.'s parental behavior, objectively reviewed, speaks for itself, for

she unquestionably failed to provide for her children's safety and welfare, and to sufficiently supply them with adequate food, stimulation, and quality maternal interaction. Tragically, she placed her charges in extremely precarious and perilous positions subjecting them to potential serious injury-(ies).

Particularly, Ms. K. exhibited negligent parenting, a lack of insight, guidance, and judgment, and exposed her children to dangerous and harmful conditions, all as referred to herein, which acts are not deemed accidental in nature and all of which caused or created the type of harm prescribed by statute. *(See,* Family Ct Act § 1012 [e] [ii].) In fact, the experts identified such disabilities and impairments and the court finds them to be derived from and proximately caused by the mother's conduct. Without immediate remedial court action to preserve the well-being of each child there is a likelihood that mother's improper behavior will continue in the future. But for the grace of God and the fortuitous involvement of well-meaning individuals at the time of the occurrences, these innocent children were spared further serious, and possibly fatal consequences.

Upon the totality of the credible evidence it is concluded that the petitioner has sustained its legal burden *(see,* Family Ct Act § 1046 [b] [i]), and as such, Sarah and James K. are adjudicated abused children at the hands of respondent. Unquestionably, the aid of the court is required, for if parents fail to provide the love, understanding, and protection demanded by their children, to "a degree which is rationally deemed to be dangerous, society, through the State, must intervene." *(See, Matter of Maureen G.,* 103 Misc 2d 109, 117, *supra.)*

A dispositional hearing shall occur on February 7, 1989, at 2:00 P.M. Petitioner to submit a dispositional plan to the court and counsel 72 hours prior to said date. Pending disposition all existing orders shall remain in full force and effect.